## APPEAL OF THE INTERNATIONAL BOILER WORKS CO.

Docket No. 2322.   Submitted July 16, 1925.   Decided January 12, 1926.

1. Taxpayer's factory was destroyed by fire in July, 1919. In addition to specific insurance on its property, it had a policy of use-and-occupancy insurance, under which the insurer was liable " for the actual loss sustained of net profits on the business which is

thereby prevented," measured by a fixed amount per day for the number of days of suspension of business. Taxpayer's fiscal year ended September 30, when business was still suspended. Subsequently, on November 13, parties agreed on amount of use-and-occupancy insurance, which was paid on November 26. *Held*, Commissioner correctly treated such proceeds as accrued income of 1919 to extent of amount known at end of year. *United States* v. *Supplee-Biddle Hardware Co.*, 265 U. S. 189, distinguished.

2. Proceeds of use-and-occupancy insurance *held* not proceeds of an involuntary conversion of property, within section 234 (a) (14) Revenue Act of 1921.

3. Where separate properties are separately insured, taxpayer may treat the gain under one policy as subject to section 234 (a) (14) and the loss under another as a deduction.

4. Invested capital is properly reduced where an amortization deduction is made under section 234 (a) (8).

*William D. Harris, Esq.*, and *H. S. Waters, C. P. A.*, for the taxpayer.

*Ellis W. Manning, Esq.*, for the Commissioner.

Before STERNHAGEN, LANSDON, and LOVE.

The Commissioner determined a deficiency of $21,192.25 for the fiscal year ended September 30, 1919, from which the taxpayer appeals as to an amount between $8,000 and $9,000. Six errors are assigned and eight propositions of law are set forth to sustain them. No testimony was given at the hearing, the parties having agreed upon the facts and embodied them in a written statement filed. The facts are therefore found verbatim as agreed.

### FINDINGS OF FACT.

1. The International Boiler Works Co. is engaged in the manufacture of steel boilers, tanks, stacks, and general plate work. Prior to July 2, 1919, this business was carried on in two factories of wood construction, located in East Stroudsburg, about a mile apart, known as the Analomink and the Minnisink shops. On that date the Analomink plant was destroyed by fire and the company thereafter erected a new fireproof factory approximately equal in size to both old ones combined and, when it was completed and put in operation, the Minnisink factory was abandoned.

2. The tax returns of the company are rendered and its books of account kept on the basis of the fiscal year ending September 30. The accrual method of accounting is employed.

3. As compensation for the loss of the Analomink factory, the company received insurance aggregating $81,972.95, of which $66,973.01 was for loss of buildings, machinery, and equipment, and $14,999.94 was use-and-occupancy insurance. Settlement of the in surance on material, buildings, and machinery was made and re-

ceived prior to the close of the fiscal year ended September 30, 1919. The amount insured under the use-and-occupancy policies, which the company carried on the Analomink plant, was $25,000. The terms of the policies pertaining to this class of insurance are stated on page 15 of the appeal petition of the taxpayer (hereinafter set forth), where a copy of the use-and-occupancy insurance form is shown. This form attached to a standard fire insurance policy of the State of Pennsylvania comprised the insurance contract. The aggregate per diem liability under the policies in case of a total suspension of business (referred to in the fourth paragraph of the form, where the words "see list" are inserted) was $83.33 per day. The loss paid, $14,999.94, represented the total per diem liability for a period of 180 days, agreed upon between the insurers and the company as the time which would be required to replace the destroyed factory. The agreement concerning the period of replacement was reached at a conference on November 13, 1919, between the representatives of the insurers and of the company, and the loss was paid on November 26, 1919.

4. Work incident to the construction of the new factory of the company was commenced immediately after the fire, and the building was completed on or about April 1, 1921, and put in operation on or about September 30, 1921. The cost of the new plant complete was $423,162.80, of which the sum of $364,664.36 is the cost of the building, $34,428.96 the cost of new machinery, and $24,069.48 the cost of the machinery in the Minnisink factory, depreciated to the date of removal, which was transferred to the new plant. The business carried on and the class of articles produced in the new factory are the same as those of the two old shops.

5. The sum of $66,973.01, fire insurance proceeds, mentioned in paragraph 3 above, comprised $10,156.25 paid for loss of materials; $15,915.25 for loss of buildings; and $40,901.51 for loss of machinery. The policies under which these sums were paid covered or insured the building, machinery, and contents separately and for different amounts, and the losses under the policies were adjusted separately for each class of property. The cost of the destroyed buildings, depreciated to the date of the fire, was $20,974.41, and the cost of the destroyed machinery, likewise depreciated, was $24,029.61. The company did not maintain a system of costs to show the value of the destroyed materials, and the insurance received for this class of property was included in its books and in its taxable income for the fiscal year 1919 as a reduction in the cost of materials used.

6. The plans for the new shop contemplated a manufacturing capacity approximately equivalent to that of the Analomink and the Minnisink plants combined. The working floor space of the

destroyed Analomink shop was 19,200 square feet, and the Minnisink factory contained 45,500 square feet, of which 12,800 feet was the area of an addition erected in 1918 for war purposes and abandoned after the Armistice in November, 1918. This addition was refitted after the fire and used until the new plant was occupied. The working space in the new factory comprises a main building of 50,000 square feet and two wings of 8,000 feet each. It was known to the company that the Minnisink shop would be abandoned when the new factory should be occupied. The materials and design of the shop make it useless for any other purpose, and it has no salvage value. The cost of the building (and its March 1, 1913, value) depreciated to the date of the fire, was $24,974.17. The period required to erect the new factory was orally agreed upon with the contractors as six months, and the plans contemplated occupancy by the company by September 30, 1920. The new factory was to be erected on the site of the Analomink shop, the area of which had been extended by purchases of adjoining parcels in 1916 and September, 1919. Plans for the new shop had been drawn, bids secured, the contract for the building let, and the contractor had his erecting equipment on the site by September 30, 1919. Between that date and October 15, 1919, the company learned that the property could not be used because title to a 20-foot strip across it belonged to the owner of an adjacent piece of land, who came forward and asserted his rights. Negotiations with him extended to December 8, 1919, when the company purchased his property. The newly acquired land was more suitable for the requirements of the company, and the factory was erected there with slightly altered plans and under a substituted contract with the same builder. The building was completed and occupied, as stated in paragraph 4 above.

7. A loss of $22,586.03 was sustained by the company on account of amortization due to the abandonment of certain facilities acquired for the production of articles contributing to the prosecution of the war. The facilities comprised an addition to the Minnisink factory erected in July, 1918, and a 200-ton flanging press installed on or about November 1, 1918, in the extension of the factory. These properties were of no use after they were acquired and were abandoned immediately after the Armistice in November, 1918. Later, as stated in paragraph 6 above, the addition to the Minnisink shop became of temporary service and the flanging press also was subsequently employed in manufacturing, but consideration has been given to these uses in determining the amount of amortization. The amortization period, determined under article 185 of Regulations 62, and agreed to by the parties, is the period from January 1, 1918, to and including December 31, 1918.

The material terms of the use-and-occupancy policy, as shown on page 15 of the appeal petition, referred to in paragraph 3 of the agreed statement, are as follows:

80% Bldg. & Cts. Rate                                    Rate Page 52-16
.89+10%=.98

THE INTERNATIONAL BOILER WORKS COMPANY.

East Stroudsburg, Pa. "Analomink Plant."

BUSINESS INTERRUPTION INDEMNITY.

USE AND OCCUPANCY INSURANCE.

$———— On the use and occupancy of the Main Building, Machinery, Equipment & Stock situated Map—Page 20—King St., Town of East Stroudsburg, State of Pennsylvania and occupied for the manufacture of boilers and other purposes not more hazardous, known as "Analomink Plant."

The word "business" wherever used in this contract shall be considered and held to have the following meaning according to the class of property insured:

(a) In a MANUFACTURING property: "The production of goods."

(b) In a MERCANTILE property: "The sale of goods."

(c) In OTHER CLASSES of property: "The carrying on of the business operations usual to the class."

The word "day," however modified, wherever used in this contract shall be held to cover a period of twenty-four (24) hours.

If the said building, or machinery or equipment or stock contained therein be destroyed or damaged by fire occurring during the life of this policy so as to necessitate a total or partial suspension of business, this Company shall be liable under this policy for the actual loss sustained of net profits on the business which is thereby prevented, and for such fixed charges and expenses as must necessarily continue during a total or partial suspension of business, for not exceeding such length of time as shall be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of said building and machinery and equipment and stock as may be destroyed or damaged, commencing with the date of the fire and not limited by the date of expiration of this policy, under the following terms and conditions, to wit:

During the time of a total suspension of business, liability under this policy shall not exceed (see list) per day for each business day of such suspension.

During the time of a partial suspension of business the per diem liability under this policy shall not exceed the same proportion of the per diem liability which would have been incurred by a total suspension of business, as the proportion by which the daily business at the time of the fire, is decreased.

Liability hereunder shall not exceed the amount of insurance by this policy nor a greater proportion of any loss than the insurance hereunder shall bear to all insurance, whether valid or not, covering in any manner the loss insured against by this policy.

It is a condition of this insurance that the assured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings, or by the suspension, lapse or cancellation of any license, or for any other consequential damage.

It is a condition of this insurance that if covering on replacement of stock in a manufacturing property no liability is assumed on account of damage to the finished product or for the time required to reproduce any finished product which may be damaged.

It is a condition of this insurance that as soon as practicable after any loss, the assured shall resume complete or partial operation of the property herein described and shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced, and in the event of the assured continuing business, in whole or in part, at some other location or using other property during the time occupied in repairing or reconstructing the building named herein, the net profits so earned shall be deducted from the amount that under the terms of this policy would otherwise be recoverable by the assured.

Surplus machinery or duplicate parts thereof, equipment or supplies, and. if this policy covers on stock, surplus or reserve stock, which may be owned, controlled or used by the assured shall, in the event of loss, be used in placing the property in condition for the resumption of business.

In case the assured and this Company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

Other concurrent insurance permitted.

### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be made on 15 days' notice, under Rule 50.

### OPINION.

STERNHAGEN: The first dispute arises out of the taxpayer's policy of so-called use-and-occupancy insurance from which, in 1920, it received proceeds amounting to $14,999.94. Of this amount the Commissioner regarded $7,500.02 as income accrued to the taxpayer in the fiscal year 1919. The taxpayer contends that no part of this amount accrued to it in the taxable year, and, secondarily, that if it be held that there was an accrual of any part of this amount in the taxable year, such accrual was not income because the proceeds of such insurance are in their nature not income.

The policy was in effect when the fire occurred on July 2, 1919. It is not disputed that the fire was the occasion for an immediate obligation of the insurance company to the taxpayer under the insurance contract. The contract provided that the corporation would be liable " for the actual loss sustained of net profits on the business which is thereby prevented, and for such fixed charges and expenses as must necessarily continue during a total or partial suspension of business, for not exceeding such length of time as shall be required with the exercise of due diligence and dispatch to re-

build, repair, or replace," etc. The liability was limited to $83.33 per day for each business day during the time of total suspension of business. The assured was required to do everything practicable, including the use of other property, to reduce the loss, any net profits earned being deducted from the amount of the insurer's liability. In the event of disagreement upon any question affecting the amount of loss, reference to appraisers was provided for. Such a reference to appraisers was the same as in the standard policy covering property insurance.

From the facts it appears that the taxpayer and the insurance company did not agree until November 13 as to the number of days which were to be taken as the measure of time required to rebuild and to be used as the multiplier of $33.33 to determine the total amount for which the insurance company was liable. The taxpayer therefore contends that there was, prior to September 30, 1919, no accrued liability of the insurer which could be regarded as an accrual to the taxpayer. The Commissioner avoids the question as to the date of accrual of the full amount of the insurance company's liability and treats as an accrual only so much as represents the product of multiplying $83.33 by the number of days within the fiscal year in question. This is all we are called upon to consider, and it is our opinion that the Commissioner was warranted in treating the amount as accrued to this extent. During the fiscal year in question the taxpayer was unquestionably entitled under its contract to that amount. Upon the last day of that fiscal year it had an enforceable right to at least an amount representing the total per diem liability for the number of days of suspension then known to have taken place as the result of the fire. Whether the measure of its right was greater than this we need not consider, since it is not in issue.

Having decided that the amount of $7,500.02 was properly accrued during the taxable year, we must consider whether this accrual is taxable income. The taxpayer urges that it is merely a replacement of a property right, being the right to earn income, and hence that it is in effect a return of capital. It is also urged that the situation is fundamentally similar to that passed upon by the Supreme Court in *United States* v. *Supplee-Biddle Hardware Co.*, 265 U. S. 189. Both the facts and the question in that case are so substantially different from those before us here that we can not regard that decision in point. The court, having before it the question whether the proceeds of a life-insurance policy received by a corporation upon the death of its president were taxable income, decided that the express exclusion from gross income contained in section 213 (a) (1) of the Revenue Act of 1918 applied to corporations as well as

individuals, and this made it unnecessary to decide whether the amount so received was income which would otherwise be taxable.

It may be seriously doubted in any event whether the proceeds of use-and-occupancy insurance, such as that now before us, would be subject to the same considerations as those applicable to life insurance. The insurance is expressly stated in the policy to be against the loss of net profits on business prevented. Such profits, had they not been lost, unquestionably would have been gross income, and there is no reason why an amount received in substitution for net profits should be any more excluded from tax than if received directly in the conduct of the business. But the taxpayer presents the argument that the right to earn profits is a property right, and that the insurance proceeds were only the pecuniary conversion of this property right, which, like other property, is not taxable except as it comes in from capital or labor or both combined. The argument is too attenuated to merit lengthy discussion. All that is responsible for earnings, such, for example, as the hand and brain of man, is not capital under the statute. We therefore hold that the amount of $7,500.02 was correctly treated by the Commissioner as gross income within the taxable year.

The taxpayer asserts further that the entire amount accrued under this policy for use-and-occupancy was the proceeds of an involuntary conversion of property expended in replacement, and that, under section 234 (a) (14) of the Revenue Act of 1921, made expressly applicable to prior years, it is entitled to deduct the amount so received. This argument, like the argument of the foregoing contention, takes the postulate that the proceeds of use-and-occupancy insurance is the conversion of property into cash. Since we have held above that this is not true, it follows that section 234 (a) (14) is not applicable and that hence there is no provision for the deduction claimed.

Under its general policy for fire insurance upon its properties the taxpayer, as shown by the agreed statement of facts, was separately insured against loss of materials, loss of buildings, and loss of machinery, and the liability for each of these losses was separately adjusted. The liability under the policies was measured by the value at the time of destruction, and thus it happened that there was a. gain to the taxpayer in the proceeds of the policies upon materials and machinery. As to the buildings, however, the taxpayer suffered a loss of $5,059.16, representing the difference between the proceeds of insurance and the cost less depreciation. This loss the taxpayer claims the right to deduct, while at the same time it applies section 234 (a) (14), *supra*, so as to deduct proportionately the gain realized upon the machinery. The gain upon the materials is not in issue,

because the taxpayer has applied this to the cost of goods sold. The Commissioner urges that, if section 234 (a) (14) is to be applied, the taxpayer must treat all of the amounts received as insurance for the destruction of its property as a single sum, and that it may not segregate the amounts received under different policies for different properties and select those which it desires to subject to the general gain or loss provisions and those to which it desires to apply the provision as to involuntary conversion.

We see nothing in the statute to require treatment of the proceeds as a unit. If a taxpayer, for example, has two separate plants, on each of which it receives a specified amount upon destruction or condemnation, there is no reason why it may not apply the one specific amount to the reconstruction of the one plant, claiming under section 234 (a) (14), and determine its gain or loss upon the other without reconstruction. The provisions of section 234 (a) (14) are relief provisions by which a taxpayer may postpone the taxation of so much of the gain derived from an involuntary conversion as it uses in replacement. It may not be permitted to postpone the taxation of the gain derived from the conversion of one piece of property merely because it elects to use the proceeds in replacing another piece of property. On the other hand, the Commissioner may not deny it the deduction of a loss in the one case if the taxpayer elects to keep the two funds separate. Of course, in the present appeal, the taxpayer may not use the proceeds of the machinery insurance for the purpose of replacing the buildings and at the same time claim its loss on the building proceeds. It is only by using the proceeds for the replacement of the specific property covered thereby that section 234 (a) (14) may be made applicable. We hold, therefore, that the taxpayer may properly deduct the $5,059.16 from gross income, irrespective of the provisions of section 234 (a) (14).

The taxpayer assigned as error the Commissioner's disallowance of obsolescence of certain property, claiming that the period of obsolescence is 15 months instead of 27 months. The Commissioner concedes his error. The Commissioner also concedes that he erred in excluding from invested capital the amount of $11,812.74, received as insurance proceeds and used in replacement under section 234 (a) (14). *Appeal of National Grocer Co.*, 1 B. T. A. 688.

We find no error in the Commissioner's reduction of invested capital at the beginning of the fiscal year by a proportionate amount of the deduction allowed as amortization of war facilities during the calendar year 1918. The taxpayer's contention, in effect, is to say that, although it may offset 1918 income by an amortization deduction, yet it may nevertheless regard such a deduction as fictitious and not in fact reflecting a disappearance of capital. The purpose of

the amortization allowance is to give a taxpayer immediate relief from an investment for war purposes which gave him no peace-time utility. *Appeal of Moore Investment Co.*, 2 B. T. A. 579; *Appeal of Walcott Lathe Co.*, 2 B. T. A. 1231. Claiming this successfully, he may not at the same time be heard to say that the investment is still worth its cost for invested capital purposes.