## APPEAL OF RETAILERS FIRE INSURANCE CO.

Docket No. 3733. Submitted October 12, 1925. Decided April 8, 1926.

1. Taxpayer, a fire insurance company, was under contract obligation to refund to its policyholders 50 per cent of its net income for the year. *Held*, that such liability is an expense incurred during the taxable year and a proper deduction from income.

2. *Held, further*, that an amount paid in settlement of fire losses occurring and reported in the taxable year, but adjusted after the close of the taxable year, is deductible from income of the taxable year.

*Charles F. Miller, Esq.*, for the taxpayer.

*Geo. G. Witter, Esq.*, for the Commissioner.

Before GREEN and PHILLIPS.

This is an appeal from the determination of a deficiency of $10,895.22 income and excess-profits taxes for 1919 and 1920. Three errors are alleged, as follows:

(1) An increase in net income of $1,007.50;

(2) The failure to allow as a deduction $3,292.50, reserve for unpaid losses; and

(3) The refusal to permit taxpayer to deduct amounts alleged to have been incurred during the taxable years as liabilities to refund to policyholders a portion of the premiums paid.

#### FINDINGS OF FACT.

Taxpayer is a corporation organized under the laws of Oklahoma, with its principal place of business at Oklahoma City. During 1918, 1919, and 1920, the company was engaged in writing one-year fire and tornado insurance policies in the States of Oklahoma, Kansas, and Nebraska. The taxpayer is organized with capital stock upon which dividends are paid, but during the years in question had made provision for participation by its policyholders in its profits.

In 1912 taxpayer adopted a by-law reading as follows:

That on the first day of November in each and every calendar year, the books of the company shall be closed and the profits of the company ascertained. After the payment of all return premiums, losses, expense of adjustment, deduction of standard reserves and other expenses of the conduct of the company's business having been deducted, the net profits shall be divided into two equal parts: To-wit:

One-half of the net profits shall be applied to the company's surplus account. One-half to be applied to the policyholder's participating account, to be payable to each and every policyholder pro rata and in proportion to the earned premium paid by such policyholder, and such profits to be paid to the policyholder on or before Sixty (60) days next after such November 1st, of each and every calendar year.

On January 16, 1918, this by-law was amended to read as follows:

On the last day of December in each and every calendar year, the books of the company shall be closed and the profits of the company ascertained. After the payment of all return premiums, losses, expense of adjustment and all other expenses in conducting the company's business shall have been deducted, the net profits shall be ascertained and at the annual meeting of the Directors

on the 3d Wednesday of January of each year the Directors shall determine the amount to be applied to the policyholder's participating account out of the net profits, and to be paid to each and every policyholder pro-rata and in proportion to the earned premium paid by each policyholder, and each policyholder to be paid his share of said policyholder's participating account, as determined by the Directors, on the expiration of his policy, and each policyholder shall share in the above profits for the year in which his policy takes effect; provided, he carries same until date of expiration. After determining the amount to be applied to the policyholder's participating account, the Directors shall have full power to apply the balance of the net profits to the company's surplus account, out of which dividends to the stockholders may be declared by the Directors.

Prior to and during the years 1918, 1919, and 1920, the executive committee of the taxpayer was authorized to take such steps·to advertise the taxpayer's business as might be for the best interests of the company. Pursuant to such authorization the business of the taxpayer was extensively advertised throughout the States in which it did business, in magazines and newspapers, by pamphlets, circulars, and personal letters, and otherwise. These advertisements were to the general effect that the company employed no solicitors and that the savings thus effected were returned to the policyholders, and contained such statements as:

" the net profits of the company are divided half and half between the policyholders and the stockholders, and the policyholders' half is applied to the reduction of premiums", " it divides its annual profits 50-50 between the policyholders and the stockholders", " these profits are divided between. the policyholders and the stockholders, and each policyholder receives his due proportion of the profits, either in cash or in a reduction in the price of his insurance", " the Company divides its net earnings between its policyholders and its stockholders. You share in proportion to the size of your policy", " it costs you about 25 per cent less, for the reason that instead of turning ALL the profits over to the stockholders of the company, we divide the profits into equal parts, and pay half to the stockholders and half to the policyholders. If you do not take out your share in the form of a reduced premium, you are entitled to receive it in good, hard cash," " the vital point of difference between The Retailers Fire and other companies is this: *We refund to our policyholders one-half of all the money we make each year;* "

and further statements to the effect that the refunds amounted to from 25 to 33⅓ per cent of the premiums paid.

The policies issued by taxpayer in the State of Kansas contained a rider, reading as follows:

It is hereby understood and agreed that at the end of the each and every calendar year, after the payment of all return premiums, losses, expense of adjustment and all other expenses in connection with the transaction of the company's business shall have been deducted, the net profits shall be divided into two equal parts; one-half of which shall be applied to the company's surplus account and one-half to be applied to the policyholder's participating account, same to be paid to each and every policyholder and each policyholder to be paid his share of such policyholder's participating account on the expira-

tion of his policy, said account to be based on the profits for the year in which his policy takes effect.

The taxpayer employed no agents to solicit business and its business was obtained mainly because of such undertaking to refund a portion of the premiums.

The amount to be distributed to policyholders in any year was never fixed at exactly 50 per cent of the earnings. After determining the amount of the earnings, the directors would fix a percentage of the premiums paid as the amount to be returned. The percentage so fixed was approximately 50 per cent of such profits and was applied in each case to the premiums paid during the year in which the profits were made. Such returned premium was payable only on the expiration of the policy by its terms, and no refund was made in the event of cancellation of the policy prior to its expiration.

Upon policies written in 1918, prior to July 1, the refund was fixed at 30 per cent of the premium paid, and on policies written after June, at 20 per cent. Twenty per cent of the premium on policies written in 1919, and 25 per cent on the policies written in 1920, was returned. During 1919 taxpayer refunded to policyholders, on premiums paid during the year 1918, $30,830.93. Net earnings for 1918, before such refunds, were $58,830.93. In 1920 taxpayer refunded to policyholders, on premiums paid during 1919, $44,864.82. Net earnings for 1919, before such refunds, were $93,-142.68. In 1921 taxpayer refunded to policyholders, on premiums paid during 1920, $62,296.52. Net earnings for 1920, before such refunds, were $92,048.77. In computing net income for 1919 the Commissioner allowed as a deduction $30,830.93, and for 1920 $44,-864.82.

Shortly prior to December 31, 1920, there had been reported to taxpayer two claims for policy losses by fire in the respective amounts of $4,200 and $100, against the first of which taxpayer had reinsurance to the extent of $1,007.50. Taxpayer set up on its books reserves for such unpaid losses of $3,292.50, and claimed such amounts as deductions upon its income-tax return. Such reserve was reasonable in amount. The losses were paid in January, 1921, in the amount of $3,225.58. In computing the deficiency the amount of the reserve was disallowed by the Commissioner, who also added to taxpayer's income the reinsurance in the sum of $1,007.50. The Commissioner in his answer admits error in adding said $1,007.50 to taxpayer's income.

### OPINION.

PHILLIPS: Under the decision of the Supreme Court in *United States* v. *Boston Insurance Co.*, 269 U. S. 197, it is clear that the re-

serve for unpaid losses claimed as a deduction by the taxpayer is not such a reserve as is contemplated by section 234 (a) (10) of the Revenue Act of 1918, and can not be deducted as a reserve. The question remains, however, whether the amount of the policy loss by fire is to be taken as a deduction in 1920, when the fire occurred and liability under the policy arose, or in 1921, when the amount of the loss was adjusted and paid. Section 234 (a) (10) of the Revenue Act of 1918 allows as a deduction in the case of insurance companies " (b) the sums other than dividends paid within the taxable year on policy and annuity contracts." Section 200 provides:

The term "paid", for the purposes of the deductions and credits under this title, means "paid or accrued" or "paid or incurred", and the terms "paid or incurred" and "paid or accrued" shall be construed according to the method of accounting upon the basis of which the net income is computed under section 212.

In the case of *United States* v. *Boston Insurance Co.*, *supra*, the Supreme Court had before it only the question whether a net addition to a reserve for unpaid policy losses could be deducted, decided that this was not such a reserve as was contemplated by the law, and held that the addition could not be deducted. In the course of its opinion the court indicates that such losses are accrued liabilities to be cared for as such and not as reserves. Referring to *Mc-Coach* v. *Insurance Co.*, 244 U. S. 585, the court says:

There a fire and marine insurance company sought to recover the tax assessed upon the addition during the year to "reserve funds" held against *accrued but unpaid losses*. (Italics ours.)

The court quotes with approval from that portion of the *McCoach* decision which points out that the insurance commissioner of Pennsylvania required the plaintiff there "to return each year, as an item among their [its] liabilities, the net amount of unpaid losses and claims, whether actually adjusted, in process of adjustment, or resisted." Commenting on the decision in that case, the court said:

We there distinctly ruled that the "reserve fund" of the Federal Act did not include something held by a fire and marine insurance company to cover *accrued but unsettled claims for losses*. We adhere to and reaffirm that doctrine. (Italics ours.)

The court was not called upon to determine whether losses occurring during the year but settled thereafter were "losses accrued," so as to constitute a deduction from income; and we do not conceive the expressions used by the court in the course of its opinion, and italicized above, to be determinative of that question. These expressions, however, are in substantial accord with the decision and opinion rendered soon thereafter in *United States* v. *Yale & Towne Manufacturing Co.*, 269 U. S. 422, where the court held that a muni-

tions tax for 1916, imposed by the United States on the profits on munitions manufactured by that company and sold during that year, which tax became due and payable in 1917, was properly to be deducted from 1916 income. Commenting upon the provisions of the 1916 Act and the regulations which provided for a return upon an accrual basis, the court says:

* * * It was to enable taxpayers to keep their books and make their returns according to scientific accounting principles, by charging against income earned during the taxable period, the expenses incurred in and properly attributable to the process of earning income during that period; and indeed, to require the tax return to be made on that basis, if the taxpayer failed or was unable to make the return on a strict receipts and disbursement basis.

The appellee's true income for the year 1916 could not have been determined without deducting from its gross income for the year the total cost and expenses attributable to the production of that income during the year. The reserve for munitions taxes set up on its books for 1916 must have been deducted from receivables for munitions sold in that year before the net results of the operations for the year could be ascertained. * * *

Only a word need be said with reference to the contention that the tax upon munitions manufactured and sold in 1916 did not accrue until 1917. In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, all the events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it. In this respect, for purposes of accounting and of ascertaining true income for a given accounting period, the munitions tax here in question did not stand on any different footing than other accrued expenses appearing on appellee's books. In the economic and bookkeeping sense with which the statute and Treasury decision were concerned, the taxes had accrued.

The taxpayer here became liable in 1920 to pay for the loss covered by its policy to the same extent that the Yale & Towne Manufacturing Co. became liable in 1916 for the payment of the munitions tax upon the profits of that year, and the true income of the taxpayer for 1920 could not have been determined without giving effect to that liability. The liability to pay a policy loss arising and reported in 1920 but adjusted in 1921 was as much an expense of taxpayer's business for 1920 as was the munitions tax upon 1916 income, the amount of which tax could not be fixed until 1917, an expense of the munitions manufacturer for 1916.

The same construction appears to have been placed upon the law by the Bureau of Internal Revenue, for in Law Opinion 1056, 4 C. B. 297, the Solicitor of Internal Revenue, after reaching the conclusion that, under the decisions of the Supreme Court in McCoach v. Insurance Co., supra, and Maryland Casualty Co. v. United States, 251 U. S. 342, additions to reserves for unpaid losses could not be deducted by insurance companies, points to the provision

allowing the deduction of losses sustained during the taxable year and not compensated for by insurance or otherwise, and states:

Under the law they are entitled to deduct the several items included in unpaid losses as "losses," and to allow them also to include these items in reserves the net additions to which may be deducted from gross income in determining the taxable income of such companies, would be in effect to permit them a double deduction, a result which can not be presumed to have been intended by Congress.

It has uniformly been held by the Bureau that a loss from fire results in the year in which the fire occurs. In T. B. R. 55, 1 C. B. 123, the Advisory Tax Board had under consideration the case of a fire which occurred in one year, the loss being partially covered by insurance and not settled until a future year. The decision reached was as follows:

The Advisory Tax Board, therefore, recommends that in those cases in which a loss occurs in one taxable year, the taxpayer should compute his loss by deducting from the total loss the estimated amount of the recoverable insurance. The loss so determined should be deducted from the taxpayer's income of the year in which the loss was sustained. If subsequent events demonstrate that this estimate was substantially inaccurate, an amended return should be filed correcting the mistake.

To the same effect is the decision of the Bureau in I. T. 2150, IV–1, C. B. 147, where the Bureau had under consideration the deductibility of a fire loss which occurred in 1920. After determining that a loss was sustained, the ruling continues:

There remains the question, During what period was the loss sustained?

In cases of claims for unliquidated damages and in cases of indeterminable or contingent liability, it is held that the loss is sustained when the claim is paid or put in judgment, or when a definite liability is incurred. The instant case is distinguishable. Upon the destruction of the building the extent of the M Company's liability which measured its loss was immediately determinable, being controlled by the replacement cost of the buildings at that time. The liability to replace the buildings rested upon a definite, contractual obligation, was clear and undisputed, became fixed at the time of the fire, and was thereafter promptly satisfied. Also the M Company returned its income on an accrual basis, both items of gross income and all deductions being treated uniformly on that basis. Under such circumstances, it is logical to say that the loss was sustained by the M Company at the time of the fire, when the liability was incurred.

The Board has given the same construction to the law. *Appeal of International Boiler Works Co.*, 3 B. T. A. 283.

Considerable light as to what deductions were intended to be allowed to insurance companies may be gained from the legislative history of the provisions governing insurance companies. *McCoach v. Insurance Co.*, *supra*, holding that the addition to a reserve for unpaid losses could not be deducted by an insurance company and indicating that the losses were to be deducted when incurred, was

decided by the Supreme Court in 1917. Thereafter, the Revenue Act of 1918 was passed continuing the provisions of the 1916 Act. The decision of the Supreme Court in the *Maryland Casualty Co.* case, *supra*, which appeared to overrule the decision in the *McCoach* case, was rendered in 1920. The following year the Revenue Act of 1921 was adopted and contained the following definition of losses deductible by insurance companies (sec. 246 (b) (6)) :

The term " losses incurred " means losses incurred during the taxable year on insurance contracts, computed as follows :

To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year, and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year. To the results so obtained add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

This provision of the law appears to have been inserted for the purpose of clearing up the uncertainty which existed after the decision in the *Maryland Casualty Co.* case and of restating and affirming the law and regulations as they existed under the decision in the *McCoach* case and prior to the decision of the *Maryland Casualty Co.* case.

After careful consideration of the decisions of the Supreme Court, the rulings of the Bureau of Internal Revenue, and the legislative history of the tax statutes as they affect this deduction, we are of the opinion that the taxpayer is entitled to deduct in 1920 the amount of $3,225.58 paid by it in January, 1921, in settlement of the fire losses which occurred in December, 1920, liability for which it appears to have recognized when it set up reserves on its books in December, 1920.

The taxpayer claims that it became liable to refund to its policyholders 50 per cent of its net earnings for each taxable year; and that such amount is deductible from the income of the year in which such earnings were made. It does not appear to be questioned that such refunds are in the nature of ordinary and necessary expenses, analogous to commissions to agents, advertising, or other expenses of securing business, and are deductible. The Commissioner and taxpayer differ only as to the year in which the amount is deductible. Such expenses, in the case of a taxpayer keeping its accounts on an accrual basis, are to be deducted when " incurred." The Commissioner contends that, under the by-laws of the company, the amount to be refunded to policyholders was within the discretion of the directors of the taxpayer and that no liability was incurred until the annual meeting took place some time after the end of the year. The taxpayer contends that a contract was created between the corporation and its policyholders by which the corporation became

bound to refund 50 per cent of its net earnings to the policyholders, and that this contract is not affected by any provision of the by-laws which are made for the internal regulation of the company and are not binding on strangers without notice.

The company informed the public by way of advertisements, circulars, letters, and otherwise, that 50 per cent of the net earnings of each year would be distributed to those taking out policies in the company during such year. The law is well established that an offer may be made to the general public and that acceptance thereof will result in a contract. The statements made by the insurance company were more than statements of a future intention; they were statements of what the company would do if insurance were written. The statements are definite and fix with exactness the agreement for a refund which is to exist between the company and the policyholder. If any ambiguity exist, and we see none, it is made clear in the rider which was attached to the policies issued in Kansas, setting out the terms of the agreement in the form of an express, written contract. We must also consider the fact that such a refund had been the established policy of the company for many years and that many of its policyholders had been such in the past and had received such refunds.

In our opinion the taxpayer was obligated by contract to distribute one-half of its profits for each of the taxable years among its policyholders. This contractual liability can not be impaired by any limitations contained in the by-laws, for these were not communicated to the policyholders, and it is well established that such by-laws are made for the internal regulation of the corporation and are not binding on strangers without notice where the officers of the corporation act within their ostensible authority. The amount of the refund constitutes a part of the cost of transacting the business of the year in which the policies were written, to the extent of the liability incurred to refund 50 per cent of the net earnings of that year.

It is to be noted that in practice the taxpayer based its refund upon a percentage of the premiums paid, the total refund approximating or exceeding 50 per cent of its earnings. To the extent that the distribution voted was in excess of 50 per cent of its earnings, it was not in discharge of any contractual liability incurred during the year in which the policies were written. If the taxpayer saw fit to distribute more than 50 per cent of its earnings for the purpose of creating new business, or for any other purpose, this was a voluntary act upon its part creating a liability in the year of distribution. To the extent, however, of 50 per cent of its net earnings, there was a liability to its policyholders incurred during the year and existing at the close of the year which the taxpayer is entitled to deduct in

determining its net income for such year. *United States* v. *Yale & Towne Manufacturing Co.*, *supra*. Any refund to policyholders in excess of such amount, voted and paid during the succeeding year, would be deductible as an expense of such succeeding year. Upon this basis the taxpayer is entitled to deduct for 1919, $47,986.81, and for 1920, $44,317.86.

The Commissioner admitted error in overstating taxpayer's income for 1920 by $1,007.50, and proper adjustments should be made.

*Order of redetermination will be entered on 15 days' notice, under Rule 50.*