Shakertown Corporation v. Commissioner.
Shakertown Corp. v. Commissioner
Docket No. 64561.
United States Tax Court
T.C. Memo 1959-22; 1959 Tax Ct. Memo LEXIS 224; 18 T.C.M. (CCH) 106; T.C.M. (RIA) 59022; February 10, 1959
*224 Herbert Bruce Griswold, Esq., Daniel L. Ekelman, Esq., and B. C. Boer, Esq., for the petitioner. Clarence C. Roby, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: A deficiency in the income tax of petitioner has been determined for the taxable year 1952 by the Commissioner in the amount of $46,722.19. The petitioner claims an overpayment of $17,772.01 for the taxable year 1952 based upon an asserted loss carryback from the year 1953, a partial disallowance of which and the determination of additional income for the year 1952 have resulted in the Commissioner's determination of the above deficiency. The issues for decision are (1) whether the respondent has erred in including in petitioner's gross income the proceeds of certain insurance received by it as the result of a casualty loss and (2), assuming decision for the respondent on the first issue, whether the Commissioner has erred in his allocation of such insurance proceeds between the years 1952 and 1953. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioner is an Ohio corporation with its principal office at Shaker Heights, *225 Ohio. On November 2, 1957, the petitioner's corporate name was changed from the Perma Products Company to Shakertown Corporation. The return for the year involved was filed with the district director of internal revenue in Cleveland, Ohio. Petitioner's return has been made and its books have been kept for the year at issue on a calendar year and an accrual basis of accounting. Prior to August 9, 1952, petitioner owned and operated two manufacturing plants, one in Chehalis, Washington, engaged in the scoring and staining of cedar shingles, and the other in Cleveland, Ohio, engaged primarily in the manufacture of seats for motor vehicles and in the staining of cedar shingles. On August 9, 1952, the petitioner's plant located at Chehalis, Washington, was destroyed by fire. As of August 9, 1952, the petitioner had in effect, in addition to fire insurance policies on its business property, two insurance policies entitled "BUSINESS INTERRUPTION INCLUDING CONTINGENT INDEMNITY AGAINST FIRE AND EXTENDED COVERAGE PERILS," issued by Illinois Appleton & Cox, Inc., Chicago, Illinois, pursuant to authorization granted to that company by certain insurers and underwriters at Lloyd's, London. *226 The provisions of the petitioner's business interruption insurance policies referred to above which are material to the issue in this case and which are identical are as follows: "TOTAL SUSPENSION: The conditions of this contract of insurance are that if the said buildings and/or structures and/or machinery and/or equipment contained therein shall be destroyed or damaged by fire, lightning, explosion, aircraft, vehicles, windstorm or smoke as hereinafter defined, occurring during the term of this Certificate so as to necessitate a total suspension of business, then this insurance shall be liable at a rate of $4,000.00 ($6,000.00 in policy No. LAC5257L) per week for such total suspension. "PARTIAL SUSPENSION: If the property damage due to perils insured against results in partial suspension of business then this insurance shall be liable for such proportion of $4,000.00 ($6,000 excess of $4,000 in Policy No. LAC5257L) per week which the proportion of reduction in output bears to the total production which would, but for such partial suspension, have been obtained during the period of partial suspension. * * *
"In consideration of the fact that this insurance is written *227 on a per week basis, it is understood and agreed that the Assured shall make a report to the Underwriters at six months from the inception of this Certificate and further reports at intervals of six months during the currency of this Certificate showing the approximate total of the Assured's net profit plus fixed charges for the preceeding [preceding] twelve months. "Should the Assured fail to make such report the Underwriters in the event of claim hereunder, shall be permitted to inspect all records of the Assured's operations at the premises covered hereunder to determine if the amounts insured exceed the Assured's net profit plus fixed charges. Should the amounts insured hereunder exceed the Assured's net profit plus fixed charges then the weekly amounts payable will be reduced to 1/52 of the amount of the Assured's actual net profit plus fixed charges during the 12 months period preceeding [preceding] the occurrence of the loss and the total amount of the insurance hereunder shall be reduced in the same proportion, it being understood and agreed that the maximum period of insurance for which loss may be claimed shall not exceed that previously stated in the conditions of *228 this Certificate." * * *
Negotiations with the insurers as to the amounts due the petitioner under its business interruption insurance policies by reason of the destruction of its Chehalis, Washington, plant resulted in a settlement in July 1953. Under this settlement, the petitioner received from the insurers in July 1953 two payments totaling $198,749.27. This total amount represented payment of $8,825.13 for each of the first two weeks of coverage under these policies (such coverage having commenced on the 10th day following the date of the destruction of petitioner's plant) and $7,873.87 for each of the remaining 23 weeks of coverage under the policies. In connection with the settlement of its claims the petitioner submitted to the insurance adjuster a number of income statements showing its actual and estimated sales, cost of sales, selling expense, administrative expense, other income and deductions, and profit or loss from operations during the months preceding and following the fire which destroyed its plant. For the first two weeks of coverage following the fire, it was agreed that 88.2513 per cent of the weekly maximum under each policy would be paid in settlement *229 of the claim. This settlement was based upon the assumption that had the petitioner not contracted part of its work out, [1] its sales during the 6-month period following the fire would decrease 88.2513 per cent from its sales for the 6-month period immediately preceding the fire. Weekly indemnification for each of the remaining weeks of coverage was agreed to be at the rate of 78.7687 per cent of the weekly maximum under each policy. The percentage factor was computed as follows: Estimated net income for six months following fire if the fire had not
occurred
$206,930.16
Net operating loss that would have occurred during six month period
following fire if no attempt had been made by petitioner during that
period to reduce its dollar loss
$197,801.42
Total estimated dollar loss from petitioner's operations over six month
period following the fire had petitioner made no attempt to reduce its
dollar loss during said period
$404,731.58
Actual net operating loss for six month period following fire if fire had
not occurred
$111,749.82
Estimated net income for six month period following fire if the fire had
not occurred
$206,930.16
Estimated dollar loss over six month period following the fire taking into
account petitioner's attempt to reduce its dollar loss during said
period
$318,679.98
Total estimated dollar loss from petitioner's operations for six month
period following the fire had petitioner made no attempt to reduce its
dollar loss during said period
$404,731.58
100.0000%
Estimated dollar loss for six month period following the fire taking into
account petitioner's attempt to reduce its dollar loss during said pe-
riod
$318,679.98
78.7387%
The amount by which petitioner reduced its total estimated dollar loss
during the six month period following the fire
$ 86,051.16
21,2613%
*230 The loss of production sustained for said period was thus computed to be 78.7387 per cent of petitioner's anticipated total production for said period had no fire occurred. The fixed amount payable under each policy in the event of a total suspension was then mutiplied by this percentage in order to determine petitioner's dollar recovery under each policy for the 23-week period. Subsequent to the destruction of its plant, and within one year after such destruction, the petitioner expended an amount in excess of the proceeds of all its fire insurance on the property and the proceeds of its business interruption insurance in building a new manufacturing plant similar or related in service or use to the plant destroyed. Treating the proceeds of its business interruption insurance as being the proceeds of an involuntary conversion of property within the provisions of section 112(f) of the Internal Revenue Code of 1939, the petitioner did not include such proceeds in its taxable income for the years 1952 and 1953. Opinion Respondent's determination of the deficiency here involved is bottomed upon his finding that the insurance policies with which we are concerned were so-called *231 "open" as distinguished from "valued" policies. He contends that only proceeds of the latter are nontaxable because only such policies provide for recovery of a predetermined or predeterminable value of the use and occupancy of business property; that the former provides coverage only to the extent of the net profit plus fixed expense and therefore proceeds therefrom are only substitutes for income and necessarily taxable. He contends the instant policies fall within the "open" category. Petitioner's position is diametrically to the contrary. Neither party appears to dispute the other with respect to applicable statutory or case law on the first issue. Our construction of the insurance policies therefore would be dispositive of this point. An examination of The International Boiler Works Co., 3 B.T.A. 283; Flaxlinum Insulating Co., 5 B.T.A. 676; Massillon-Cleveland-Akron Sign Co., 15 T.C. 79, and Williams Furniture Corporation, 45 B.T.A. 928, among other cited cases, makes it clear that policies of insurance, regardless of their labels, which reimburse the insured for loss of net profit produce taxable income by such reimbursement *232 and policies which reimburse the insured only for loss of the availability of property for use and occupancy produce proceeds which are nontaxable. It seems clear that each of the two policies before us, within the limits of their face amounts, was intended to and did reimburse petitioner for its loss of net profit plus its fixed charges to the extent the total amount thereof did not exceed its net profit plus its fixed charges for the 12-month period immediately preceding the loss by fire of its Chehalis, Washington, property. Regardless of the method of computation of the amount finally settled upon by petitioner and its insurer, this is the insurance coverage provided by the terms of each of the policies. It is apparent that a close estimation of petitioner's loss of net profits plus fixed expense greatly exceeds the total amount recovered under the two policies, but this fact in no way indicates that its loss in earnings was not the risk insured against. It merely indicates an inadequate insurance coverage. True it is that the total effect of the two policies could result, in case of the loss insured against, in proceeds greater than the net profit plus fixed expenses of the *233 preceding 12 months, but this is only true because there happen to be two policies with identical terms (except for fact amount) ueder each of which recovery may be made. We view each policy by itself, not their total effect. Even though insufficient to cover its entire loss of net profit, the amounts petitioner did recover from the two policies of business interruption insurance constitute gross income and the Commissioner's action in so treating them is sustained. Petitioner's alternative contention is that, should the insurance proceeds with which we are concerned be held to be income, respondent has wrongfully allocated the same to its income, $151,506.05 for 1952 and $47,243.22 for 1953. It urges that all such receipts should be taken into income only in the year received, i.e., 1953, a loss-year for petitioner. In adopting this alternative position it contends that, even though its method of bookkeeping and reporting its income was on the basis of an accrual accounting system, to take into income an amount prior to its actual receipt there can be no contingency with respect to its eventual receipt, the probability of which must be reasonably certain. We find no fault with *234 this position, but do not agree with petitioner that there exists such a contingency or reasonable uncertainty under the facts before us. The event which gave rise to the receipt by petitioner of weekly amounts under the insurance policies was the fire which occurred in 1952. As each week of loss of output ensued thereafter following the first 10 days after the fire, an additional weekly payment was due. Only the amount of each payment must be computed and all of the factors necessary for such computation existed at the end of each week. The number of weeks over which the loss was to continue was the only contingency and that was resolved at December 31, 1952, when 19 loss-weeks had elapsed. Loss-weeks continued into 1953 and after 6 of them had passed the final and total determination of the entire liability of the insurer under the policies of insurance could finally be computed. Liability of the insurer to petitioner under the policies became fixed as of August 9, 1952, the date of the fire which destroyed its Chehalis property. That is the event which fixes the year in which the right to receive the insurance proceeds here at issue began to accrue to petitioner because it gave *235 rise to a fixed liability of the insurer under its policies. The International Boiler Works Co., supra; Cappel House Furnishing Company v. United States, (C.A. 6, 1957) 244 Fed. (2d) 525. Respondent has properly allocated the insurance proceeds on the basis of the number of the number of loss-weeks falling within 1952 and 1953 giving due regard to the increased payments for the first 2 weeks of coverage following the fire. Decision will be entered for the respondent. Footnotes
1. Petitioner had purchased from others sufficient manufactured material of the nature theretofore manufactured in its destroyed plant to furnish a proportion of its regular customers. It had constructed a temporary warehouse upon a concrete foundation remaining after the fire in order to store such purchased material.↩