FLAXLINUM INSULATING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5120. Promulgated November 30, 1926.

1. Use and occupancy insurance involved in this proceeding was compensation for the loss of a property right, and was not dependent upon or measured by the loss of profits in the operation of the business in connection with which such property was used.

2. The owner of the property destroyed by fire proceeded in good faith to replace the same, and the amount of the use and occupancy insurance in excess of the ordinary fire insurance received thereon used for such replacement was not a gain to be included in gross income.

3. The accrual method of accounting employed by petitioner in keeping its books clearly reflected the income for 1918, and the amount of use and occupancy insurance received during the year in excess of the portion thereof properly applicable to the cost of replacing the property in kind was a gain derived from the conversion of property and constituted gross income in that year and may not be allocated proportionately to gross income for 1919 and 1920.

*George W. Morgan, Esq.,* and *Guy Chase, Esq.,* for the petitioner.
*A. H. Fast, Esq.,* for the respondent.

This proceeding involves a deficiency in income and profits tax for the calendar year 1918 in the amount of $42,114.64. The question presented concerns the proper treatment of $80,000.10 of use and occupancy insurance received by the petitioner in 1918 in consequence of a fire which occurred on July 11, 1918, destroying one of

its warehouses and the contents thereof. This amount was in addition to amounts received as ordinary fire insurance and represented a compromise between the insurers and the insured of the amounts recoverable under the nine use and occupancy policies. The Commissioner included the entire amount of $80,000.10 in petitioner's gross income for 1918.

### FINDINGS OF FACT.

The petitioner, formerly known as the Northern Insulating Co., is a Minnesota corporation engaged in the manufacture from flax straw of an insulating material known as "Flaxlinum" and by-products known as "Flax Tow" and "Flax Shives," with principal office at St. Paul. It kept its books and rendered its returns upon the accrual basis.

The relative percentages of total production at the time of the fire were as follows:

| | |
|---|---|
| Flaxlinum | 0.394 |
| Commercial tow | .272 |
| Seed and bran (shives), | .334 |

Manufacturing operations were carried on continuously throughout the year. Petitioner purchased the flax straw from balers at a large number of points in the northwest. Persons engaged in baling established themselves in communities where flax was grown and purchased straw from farmers, baled it on the farm, and, in the majority of cases, contracted with farmers to haul the baled straw to points of shipment. In some instances petitioner made purchases direct from farmers who hauled the straw unbaled to petitioner's stacking station where the petitioner contracted to have it baled at some later date. There existed no open market in which such straw could be purchased and it was petitioner's custom to arrange with balers for its supply. An exception was made, however, with respect to the 1919 crop, which became available in September, 1919, and the early part of 1920 because of the petitioner's shortage of flax straw, as hereinafter mentioned.

The seasons in which flax straw can be obtained are usually from September to April following each crop. The largest portion of straw purchased was received during the months from November to February after each harvest in September. The straw could not be used by the petitioner in its manufacturing operations while in a green, wet, or natural state as harvested. It was necessary properly to dry and cure it, otherwise the products would heat, mold, and become lousy. The curing process was in the nature of a sweating and retting, which, after experiments over many years and at great expense, the petitioner found could best be accomplished by storage

in warehouses under certain atmospheric conditions. The process required about six months under normal weather conditions. When properly sweated and retted, the straw became very dry, resulting in the gluten being destroyed by the germs of decomposition. Thereupon the fibre was readily separable from the woody portion of the straw. Thus cured the straw would not heat, mold, or become lousy, the food upon which the louse subsisted having been destroyed. In brief, the straw could not be successfully or profitably manufactured before it had been properly cured, nor were the products of uncured or improperly cured straw commercially successful. The petitioner by experience, therefore, found it necessary or advisable to acquire and keep on hand and in process of curing from 8,000 to 10,000 tons of dried and cured straw—that is to say, it would have available at the time of harvesting the new crop about 8,000 or 10,000 tons of cured straw with which to carry on operations until the new crop could be cured and properly dried.

Petitioner had certain large warehouses which were essential in properly treating the straw for manufacturing purposes.

The quantities of flax straw consumed by petitioner have been as follows:

| In crop year commencing— | Tons. |
|---|---|
| Sept. 1, 1915 | 16,078 |
| Sept. 1, 1916 | 21,660 |
| Sept. 1, 1917 | 12,556 |
| Sept. 1, 1918 | 10,588 |
| Sept. 1, 1919 | 14,001 |

On July 11, 1918, one of the petitioner's warehouses, together with the entire contents thereof, including 6,601 tons of flax straw, was destroyed by fire, thus leaving petitioner with only approximately 2,223 tons of its basic raw material with which to carry on manufacturing operations until the 1918 crop should become available and be properly seasoned, cured and dried. Soon after the fire and before the petitioner's remaining supply of cured straw was exhausted, it obtained, during 1918, 1,908 tons of additional cured straw from stacking and baling stations and other users. This enabled the petitioner to continue full and uninterrupted operation of its plants throughout the balance of the calendar year 1918.

The quantity of flax straw consumed from July 11, 1918, to the end of that year was 4,196 tons. Of the 1918 crop the petitioner, notwithstanding it increased its price $1.50 per ton over prices which it had theretofore paid, was able to obtain only sufficient tonnage to meet its requirements for the ensuing year, leaving no amount to restore its reserve for future operations during the latter part of 1919 and the year 1920. From January 1 to the latter part of April, 1919, the petitioner, being without properly cured straw,

adopted extraordinary emergency measures of curing and drying the straw for manufacturing purposes in order to avoid a shutdown of its plant. Its drying kilns normally used only for the drying of the flaxlinum were, to 50 per cent of their capacity, devoted to drying and preparing straw. Its kiln cars designed for the drying of flaxlinum were remodeled and used for drying straw. The straw was hauled from points of storage by wagons, placed upon the remodeled cars, moved into the kilns, rehandled in the kilns to accelerate the drying, and, when this process had been completed, the straw was removed and hauled by wagons to the tow mill. The additional expense of altering the kiln cars and drying the straw was charged as operating expense necessarily incurred in providing a sufficient supply of straw to continue manufacturing operations, without which it would have been necessary to close down the plant until the new crop had become cured by the usual storage method. The process was slow because the straw could only be handled and dried while in bales.

Although " Flaxlinum " was the petitioner's principal product, tow, used for upholstering furniture, was also an important product, and, during the period of drying the straw, the output of the tow mill was reduced 50 per cent, with no reduced payroll during this drying period, inasmuch as the same number of men were required to operate the tow mill whether run at full or partial capacity. The emergency method of curing the 1918 crop of straw continued until the latter part of April, 1919, at which time a portion of the 1918 crop in the warehouses of the petitioner which had not been destroyed by fire had become sufficiently cured to admit of its being worked into flax tow, and from the latter part of April, 1919, until the following January, 1920, the petitioner was able to carry on operations in the normal way.

The 1919 crop of straw was heavy and from it petitioner succeeded in curing a sufficient quantity to supply its needs for the ensuing year and also to restore a reserve substantially equal to that which had been destroyed by fire on July 11, 1918. But, in order to acquire this quantity, petitioner not only increased its price approximately $5 a ton, as hereinafter more specifically shown, but it also purchased and operated in the flax growing territory nine baling machines, costing $850 each. No part of this cost was included in the cost of straw hereinafter stated. Again, commencing early in January, 1920, the petitioner, having used its supply of properly seasoned straw, found it necessary again to resort to the extraordinary or emergency method of curing the 1919 crop of straw. It continued this emergency method until the latter part of April, 1920, when the 1918 crop had become sufficiently seasoned and cured through the usual warehouse method for manufacturing purposes.

The straw acquired by petitioner from the 1919 crop was substantially sufficient to restore the reserve supply that had been destroyed by fire, but none of this was seasoned or ready for use until the latter part of April, 1920.

The petitioner proceeded in good faith immediately after the fire to replace its reserve of cured straw, but for the various reasons herein mentioned it was unable completely to do so until the 1919 crop became available on September 1, 1919. After May 1, 1920, it was no longer necessary for petitioner to resort to the emergency method of curing the straw, since its reserve supply had been restored. The actual cost to petitioner of straw purchased, including transportation, unloading expense, and purchasing agents' expenses, but not including any overhead expenses, such as general office expense for salaries of officers or employees not exclusively engaged upon the purchase of straw, together with the quantities purchased and the average cost per ton was, for the several crop years, as follows:

| Crop year commencing— | Tons purchased. | Total cost. | Average cost per ton. |
|---|---|---|---|
| Sept. 1, 1917 | 15, 611 | $189, 821. 92 | $12. 16 |
| Sept. 1, 1918 | 16, 524 | 227, 037. 90 | 13. 74 |
| Sept. 1, 1919 | 24, 680 | 425, 075. 55 | 17. 223 |
| Sept. 1, 1920 | 18, 048 | 235, 772. 22 | 13. 064 |

In years prior to September 1, 1917, the average cost of straw had not exceeded $12.16 per ton.

The petitioner acquired its supply of straw from farmers or balers located near or in smaller towns to which it was delivered by farmers. The territory surrounding the towns in which the balers were located from which straw could be secured was dependent upon the price which the balers were able to pay the farmers, which price included, among other items, the cost of hauling. The supply of straw in the territory from which petitioner secured its supply was at all times limited. During the crop year commencing September 1, 1918, as well as for many preceding crop years and ever since, petitioner was the largest purchaser of straw in this territory, its purchases normally being considerably in excess of the aggregate quantity of all straw purchased by all others in that territory. The increased prices paid by petitioner for its entire purchases from the crops of 1918 and 1919 over prices paid for prior crops were due to the strenuous efforts on its part to restore its necessary reserve, and, but for the increased prices paid and the baling machines purchased and operated, petitioner would not have been able to carry on its operations or to restore its reserve as it did.

In addition to the use and occupancy insurance, petitioner received ordinary fire insurance for the 6,601 tons of straw destroyed, at the rate of $13 per ton, which was on the basis of cost at that time, in the amount of $85,813.50. Petitioner also received ordinary fire insurance of $20,000 for the building, upon the basis of reproduction cost less depreciation at the date of the fire, as agreed upon.

The warehouse was designated by petitioner as Warehouse No. 4. It was of so-called balloon construction, consisting of galvanized iron sidings, tar and gravel roof, and a fire-wall through the center. Its capacity was 2,156,485 cubic feet, accommodating in excess of 8,000 tons of baled straw. The petitioner's remaining warehouse had a capacity of approximately 5,000 tons of baled straw.

Immediately after the fire the petitioner proceeded in good faith to replace the building. Because of war restrictions, petitioner was unable immediately to obtain a building permit and materials. The necessary permit was obtained, however, about the 1st of December, 1918, whereupon materials were acquired and the actual work of reconstruction of the building commenced. The warehouse was reconstructed upon the ground on which the destroyed warehouse had been located, not identically as the old one but in four units, with two fire-walls instead of two units and one fire-wall as before. The actual work of reconstructing the first two units was commenced early in January, 1919, and the work of reconstructing the last two units and the reconstruction of the old fire-wall and the construction of the additional fire-wall was commenced early in November, 1919. Functionally, the new warehouse replaced the old one. The two new units first constructed, known as Nos. 2 and 7, and one of the last units were of the same construction as the old warehouse. The fourth unit differed from the others only in that its sides were covered with plaster over flaxlinum keyboard, but its cost was the same as the other units of identically the same size built at the same time.

The actual cost of the four new units, the reconstructed fire-wall, the additional fire-wall, and the capacity of the new units was as follows:

| Description. | Cost. | Capacity (cubic feet). |
|---|---|---|
| Warehouse units 2 and 7 | $17,993.54 | 1,294,922 |
| Warehouse unit 3 | 16,968.06 | 650,624 |
| Warehouse unit 5 | 16,997.76 | 650,624 |
| Total, 4 units | 51,959.36 | |
| Fire wall 4 (reconstruction) | 9,376.45 | |
| Fire wall 6 (new construction) | 11,797.97 | |
| Total units and walls | 73,133.78 | |

The capacity of the new warehouse was greater than the capacity of the old warehouse, but the restored property, to the extent of 83 per cent thereof, effected a replacement substantially in kind and served the same purpose as the warehouse which had been destroyed.

Reproduction cost of the destroyed warehouse at the prices prevailing in January, 1919, when actual reconstruction of the new warehouse was commenced, was as follows:

| | |
|---|---:|
| Reproduction cost | $37, 549. 13 |
| Depreciation to that date | 3, 003. 93 |
| Depreciated value | 34, 545. 20 |

The second two units of the new warehouse were constructed in the months of October, 1919, to January, 1920. The reproduction cost of the original warehouse in the latter months was as follows:

| | |
|---|---:|
| Reproduction cost | $45, 446. 37 |
| Depreciation | 3, 635. 71 |
| Depreciated value | 41, 810. 66 |

At the time of the fire the petitioner held, among others, certain policies of insurance, known as "use and occupancy insurance," issued by nine different insurance companies, the aggregate face amount of which use and occupancy policies was $135,000. These use and occupancy policies were the Minnesota Standard Fire Insurance form of policy, to which was affixed and made a part thereof a rider, the material part of which was as follows:

The conditions of this contract of insurance are that if the buildings or any part thereof, their equipment or any part thereof, or the contents or any part thereof, shall be so destroyed or disabled by fire occurring during the term of this policy as to entirely prevent the assured from operating or carrying on business, then the liability of this company shall for each day of such enforced idleness be at the rate of one three-hundredth (1/300th) part of the sum insured for each working day during the period of such idleness, and proportionately for partial prevention for each day thereof.

Loss, if any, to be computed from the day of occurrence of any fire to the time when said buildings, equipment or contents thereof could, with ordinary diligence, be rebuilt, repaired, or replaced, and not limited to the day of expiration named in the policy, but in no case shall the company be liable for any sum in excess of the amount insured by this policy. Ascertainment of loss hereunder shall not await the actual rebuilding, repairing and replacing of the property or restoration of the business.

This policy does not cover loss due to stoppage of dynamos, motors or other apparatus for generating, utilizing, regulating or distributing electric current caused by defect or break in insulation or in machinery, or by electric current, whether artificial or natural.

Permission to make alterations, improvements and repairs to any building herein described, and the insurance, if any hereunder, on such building is hereby extended and made to cover on such alterations, improvements, and repairs, but the construction of additions or additional stories to, or a general

remodeling of, any building herein described, shall require notice to this Company and shall not be permitted or covered by this policy, unless specifically included by endorsement attached hereto.

One of the nine use and occupancy policies contained these provisions:

The conditions of this contract of insurance are that if the buildings or any part thereof, their equipment or any part thereof, or the contents or any part thereof, shall be so destroyed or disabled by fire occurring during the term of this policy as to entirely prevent the assured from operating or carrying on business, then the liability of this Company shall for each day of such enforced idleness be not to exceed one three-hundredth (1-300th) part of the sum insured for each working day during the period of such idleness, and proportionately for partial prevention for each day thereof.

The word "day" or "working day" as used in this contract shall be held to cover a period of twenty-four (24) hours.

Loss, if any, to be computed from the day of the occurrence of the fire to the time when said buildings, equipment or contents thereof, could, with ordinary diligence, be rebuilt, repaired, or replaced, and not limited to the day of expiration named in the policy, but in no case shall the Company be liable for any sum in excess of the amount insured by this policy. Ascertainment of loss hereunder shall not await the actual rebuilding, repairing and replacing of the property or restoration of the business.

As soon as practicable after any loss, the insured shall resume complete or partial operation of the property herein named, or shall make use of other property, if obtainable, if by so doing the amount of loss hereunder will be reduced; and in the event of the insured continuing business (in whole or in part) at some other location, or using other property during the time occupied in repairing or reconstructing the building named herein, the net profits earned at the new location shall be deducted from the amount that under the terms of this policy would be recoverable by the insured.

It is a condition of this insurance that the assured shall not be entitled to compensation on account of delay which may be occasioned by any ordinance or law regulating construction or repair of buildings. or by the suspension, lapse or cancellation of any license, or for any other consequential damage.

In case the assured and this Company are unable to agree as to any question affecting the amount of loss under this policy, the same shall be determined by appraisers in the manner provided by the policy to which this form is attached, the provisions of which policy shall govern in all matters pertaining to this insurance, except as herein otherwise provided.

This policy does not cover loss due to stoppage of dynamos, motors or other apparatus for generating, utilizing, regulating or distributing electric current caused by defect or break in insulation or in machinery, or by electric current, whether artificial or natural.

Other insurance permitted.

Permission granted to operate at night later than nine (9) o'clock p. m.

Permission granted to make alterations, improvements and repairs. and to construct attached and communicating additions and sheds (which do not change a division wall or fire wall) to any building herein described, and the insurance, if any hereunder on such building is hereby made to cover such alterations, improvements, repairs, attached and communicating additions and sheds, including building materials and supplies therefor, while contained therein or on the premises immediately adjacent thereto; but any change in a

division wall or fire wall, the removing or replacing of a floor structure or wall, or the construction of additional stories to any building herein described, shall not be permitted or covered by this policy, unless specifically included by endorsement attached hereto.

Permission granted to use electricity for light, heat and power in the premises described in this policy.

Permission granted for such use of the premises as is usual in the business of assured and when not in violation of any law, statute or municipal restriction, to keep and use all articles and materials usual to said business, in such quantities as the exigencies of the business require.

LIGHTNING CLAUSE: Except as provided in the Electrical Exemption Clause above, this policy shall cover any direct loss or damage caused by Lightning (meaning thereby the commonly accepted use of the term lightning, and in no case to include loss or damage by cyclone, tornado or windstorm), not exceeding the sum insured, nor the interest of the insured in the property, and subject in all other respects to the terms and conditions of this Policy. Provided, however, if there shall be any other insurance on said property this Company shall be liable only pro rata with such other insurance for any direct loss by lightning, whether such other insurance be against direct loss by lightning or not.

Section 3318, Minn. Gen. Stats. 1913, prescribes the Standard Fire Insurance policy for use in that State. This section also provides, *inter alia*, that the fire insurance policy may contain "printed forms for insurance against loss of rents and rental values, leaseholds of buildings, use and occupancy," and losses caused by change of temperature.

The insurance adjusters spent considerable time investigating the flax industry and the operations of the petitioner's plant in order to be able properly to determine the amount to which the petitioner was entitled for use and occupancy of the property destroyed. They found the number of tons of straw the petitioner had on hand and that the daily consumption of the plant was 40 tons of straw. From this and other facts obtained by them they determined the period of time the plant would continue operations and the extent to which operations would suffer as a result of the destruction of the building and its contents. Thereafter, the insurance companies and the petitioner agreed upon a total of $80,000.10 under all of the use and occupancy policies. The insurance companies were aware of the fact that petitioner, by resorting to the methods hereinbefore mentioned, would probably continue total or partial operations for some time to come, but they were satisfied from their investigation that, although the effect of the loss might be postponed, it would ultimately be sustained through increased prices for cured or green straw, additional expense of curing, or as a result of inability to obtain a proper supply.

One three-hundredth of the $135,000, the aggregate amount of the policies, the per diem rate provided in each of the policies, equals $450. The insurance adjusters set forth, in their proofs of loss, the

loss or damage as agreed upon with the petitioner in the following amounts:

| | |
|---|---|
| 151 days total inoperation at $450 per day_____ | $67, 950. 00 |
| 26 days partial inoperation (0.606) _____ | 7, 090. 20 |
| 33 days partial inoperation (0.334) _____ | 4, 959. 90 |
| | 80, 000. 10 |

The ordinary fire insurance for the building and straw was agreed upon soon after the fire and adjustment of the amount of the use and occupancy insurance was concluded on August 31, 1918. The total insurance was received by the petitioner in September, 1918.

The use and occupancy policies were written by the following companies in the amounts stated, and each company paid the amount shown in the following schedule.

| Policy No. | Expiration. | Name of company. | Insured. | Paid. |
|---|---|---|---|---|
| 204130 | Jan. 9, 1919 | Aetna (Connecticut) | $37, 500. 00 | $22, 222. 24 |
| 115509 | May 16, 1919 | Commercial Union (England) | 10, 000. 00 | 5, 925. 94 |
| 273626 | Feb. 1, 1919 | General Fire (France) | 5, 000. 00 | 2, 962. 97 |
| 32814 | Jan. 8, 1919 | Liverpool & London & Globe (England) | 17, 500. 00 | 10, 370. 35 |
| 5849 | Jan. 9, 1919 | Messachusetts F. & M. (Massachusetts) | 5, 000. 00 | 2, 962. 97 |
| 7639 | Jan. 9, 1919 | Pennsylvania Fire (Pernsylvania) | 10, 000. 00 | 5, 925. 94 |
| 1103359 | Jan. 27, 1919 | Phoenix (England) | 15, 000. 00 | 8, 888. 91 |
| 17548 | Jan. 9, 1919 | Rochester Ger. Unds. (New York) | 25, 000. 00 | 14, 814. 84 |
| 10928 | Feb. 2, 1919 | Springfield F. & M. (Massachusetts) | 10, 000. 00 | 5, 925. 10 |
| | | Total | 135, 000. 00 | 80, 000. 10 |

### OPINION.

LITTLETON: The Commissioner included the total of the use and occupancy insurance, amounting to $80,000.10, in the petitioner's gross income for 1918, and contends that his action in this regard should be approved for the reason that the use and occupancy policies insured profits prevented by the fire. On the other hand, the petitioner contends that the use and occupancy insurance was per diem compensation, that is, a fixed sum for each day of enforced idleness and proportionately for partial idleness, and that the settlements between the insurers and the insured were on that basis; that neither the policies nor the settlement were upon the basis of profits prevented; that no part of the $80,000.10 was taxable income for 1918 as there was no enforced idleness, either total or partial, during that year, and that the difference between the amount expended to restore the building and the reserve supply of cured straw should not be treated as income for the calendar year 1918 but should be allocated to the calendar years 1919 and 1920.

Section 3318, Minn. Gen. Stats., 1913, prescribes a standard form of insurance policy and expressly authorizes use and occupancy insurance to be inserted in such standard form of policy, but forbids

the inclusion of any clause not so authorized. The use and occupancy insurance in question was written in that manner, the provisions having been made a part of each policy as a rider. The statute does not specifically authorize insurance against profits prevented. The use of the standard form of policy is compulsory. With such changes as are specifically authorized by statute, it is the only form of insurance contract which may lawfully be used in the State. *Heim* v. *American Alliance Ins. Co.*, 147 Minn. 283; 180 N. W. 225; *Brecher Furniture Co.* v. *Firemen's Ins. Co.*, 154 Minn. 446; 191 N. W. 912.

The Board is of the opinion from the evidence that this proceeding, as far as it relates to the nature of the use and occupancy policy, is the same as that in the *Appeal of Piedmont-Mt. Airy Guano Co.*, 3 B. T. A. 1009, and that such of the amount of the use and occupancy insurance money as is equal to the amount actually expended by the petitioner to replace the warehouse destroyed by fire without added capacity or other elements of additional value and the amount expended to replace the contents thereof, in excess of the ordinary fire insurance collected thereon, should be deducted from the amount received as use and occupancy insurance. See *Appeal of Cotton Concentration Co.*, 4 B. T. A. 121.

Section 234 (a) (14) of the Revenue Act of 1921 provides as follows:

If property is compulsorily or involuntarily converted into cash or its equivalent as a result of (A) its destruction in whole or in part, * * *; and if the taxpayer proceeds forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, to expend the proceeds of such conversion in the acquisition of other property of a character similar or related in service or use to the property so converted, * * * or in the establishment of a replacement fund, then there shall be allowed as a deduction such portion of the gain derived as the portion of the proceeds so expended bears to the entire proceeds. The provisions of this paragraph prescribing the conditions under which a deduction may be taken in respect of the proceeds or gains derived from the compulsory or involuntary conversion of property into cash or its equivalent, shall apply so far as may be practicable to the exemption or exclusion of such proceeds or gains from gross income under prior income, war-profits and excess-profits tax Acts.

Article 49 of Regulations 45, relative to the situation covered by the above section, is in part as follows:

In the case of property which has been lost or destroyed in whole or in part through fire, * * * the amount received by the owner as compensation for the property may show an excess over the value of the property on March 1, 1913, or over its cost, if it was acquired on or after that date (after making proper provision in either case for depreciation to the date of the loss, damage, or transfer). The transaction is not regarded as completed at this stage, however, if the taxpayer proceeds immediately in good faith to replace the property, or if he makes application to establish a replacement fund as provided in the following article. In such a case the gain, if any, is measured

by the excess of the amount received over the amount actually and reasonably expended to replace or restore the property substantially in kind, exclusive of any expenditures for additions or betterments. The new or restored property effects a replacement in kind only to the extent that it serves the same purpose as the property which it replaces without added capacity or other element of additional value. * * *

Applying the provisions of section 234 (a) (14) and the Regulations as construed in the *Appeal of Cotton Concentration Co.,* *supra,* we find that the petitioner expended $73,133.78 for the four units of the new warehouse, the replacement of the old fire-wall, and the construction of the additional fire-wall as follows:

For the four warehouse units, Nos. 2, 3, 5 and 7_____ $51,959.36
For the reconstruction of the old fire-wall (No. 4)___ 9,376.45
For the construction of the additional fire-wall
(No. 6) _____ 11,797.97
                                                       _____
    Total _____ 73,133.78

From the above sum there should be eliminated the cost of the added capacity of the new warehouse and the cost of the additional fire-wall. The capacity of the old warehouse was 83 per cent of the capacity of the new, and that percentage of the cost of the new units is $43,126.26. Eliminating the additional fire-wall costing $11,797.97, and including the old fire wall replaced at a cost of $9,376.45, we have a total of $52,502.71 of the warehouse replacement cost compensable out of the total insurance received. There was ordinary fire insurance on the destroyed warehouse in the amount of $20,000, leaving $32,502.71 of the warehouse replacement cost compensable out of the use and occupancy insurance.

What has been said relative to the replacement of the destroyed warehouse applies also to the replacement of its contents, and such amount of the use and occupancy as is equal to the additional cost of replacing the petitioner's reserve of cured straw, that is, the excess of the ordinary fire insurance collected thereon, should be deducted from the use and occupancy insurance.

There were destroyed 6,601 tons of straw for which the petitioner received on its ordinary fire insurance policies sums aggregating $85,813.50, which was at the rate of $13 per ton. Immediately after the fire the petitioner began efforts to restore its reserve of straw but was unable to do so until the crop year commencing September 1, 1919. It was unable to recoup any of the reserve out of the 1918 crop. The average cost to the petitioner of the straw purchased from the 1919 crop was $17.223 per ton. The increased cost was the difference between $13 and $17.223 or $4.223 per ton, which, on 6,601 tons, equals $27,876.02. That amount of the use and occupancy insurance money should not therefore be regarded as taxable gain, but should be allocated to the cost of restoring the straw.

The petitioner further contends that the remainder of the use and occupancy insurance, amounting to $19,621.37, should be deferred or allocated proportionately to the calendar years 1919 and 1920, in which it is claimed occurred the interruption of operations which the insurance was intended to compensate. This contention might have weight if the $80,000.10 represented reimbursements for profits prevented, as was the situation in the *Appeal of International Boiler Works Co.*, 3 B. T. A. 283, but we have already held that under these policies the thing insured was not the possibility of profits or losses, nor profits which might be earned during 1918 or any future time, but the amount paid represented compensation to the petitioner for the right to use and enjoy the property for any purpose to which the company might be able to devote it; the sum of the ordinary fire insurance and the use and occupancy insurance represented nothing more than compensation for loss of the useful value of the building and its contents to the petitioner in its business. In these circumstances, we do not find merit in the petitioner's claim that a portion of the amount received in final settlement in 1918 over the amount required to replace the physical property should be spread over subsequent years. Section 213 (a) of the Revenue Act of 1918 provides that the term "gross income" includes, among other items, "gains or profits and income derived from any source whatever," and that "the amount of all such items shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under methods of accounting permitted under subdivision (b) of section 212, any such amounts are to be properly accounted for as of a different period." Section 212 (b) provides that the net income shall be computed upon the basis of the taxpayer's annual accounting period in accordance with the method of accounting regularly employed in keeping the books of the taxpayer, but if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. The petitioner regularly employed the accrual method of accounting in keeping its books and, in the opinion of the Board, such method clearly reflected the income. We are not warranted, therefore, under the statutes in adopting the method of computing income for 1918 which will exclude therefrom the amount of insurance received and allocate same to subsequent years. The statute contemplates that items of income and deductions shall be treated consistently. Had the property destroyed in 1918 not been insured, a loss would have been sustained which could not under the Revenue Act of 1918 have been accounted for as of a different taxable year, and, since it can not be said that the method of accounting employed did not

clearly reflect the income, we must hold that the excess of the insurance over the amount required to restore the property was income in 1918. This was no less income in 1918 because received in the form of insurance than it would have been had it resulted from a voluntary sale of property for an amount in excess of the cost or March 1, 1913, value thereof.

*Judgment will be entered on 15 days' notice, under Rule 50.*

PHILLIPS concurs in the result only.