**SHAKERTOWN CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE,** Respondent.

No. 13961.

United States Court of Appeals
Sixth Circuit.

April 22, 1960.

Bruce Griswold, Cleveland, Ohio (Ben C. Boer and Daniel L. Ekelman (of Calfee, Fogg, McChord & Halter), Cleveland, Ohio, on the brief), for petitioner.

Carter Bledsoe, Washington, D. C. (Charles K. Rice, Lee A. Jackson A. F. Prescott and Carter Bledsoe, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before MILLER, WEICK and O'SULLIVAN,* Circuit Judges.

SHACKELFORD MILLER, JR., Circuit Judge.

---

* On the day of the oral argument of the case in this Court, Judge O'Sullivan was a District Judge sitting by designation.

He was sworn in as Circuit Judge on April 4, 1960.

The petitioner, Shakertown Corporation, seeks a review of the decision of the Tax Court which upheld a deficiency assessment by the Commissioner in petitioner's income taxes for the year 1952 in the amount of $46,722.19.

The material facts, which are not in dispute, are as follows. The petitioner is an Ohio corporation with its principal office in Shaker Heights, Ohio. Its corporate name was changed from The Perma Products Company to Shakertown Corporation on November 2, 1957. Its books are kept on an accrual basis of accounting.

Prior to August 9, 1952, the petitioner owned and operated two manufacturing plants, one in Chehalis, Washington, engaged in the scoring and staining of cedar shingles, and the other in Cleveland, Ohio, engaged primarily in the manufacture of seats for motor vehicles and, in addition, in the staining of cedar shingles on a small scale. On August 9, 1952, the petitioner's manufacturing plant at Chehalis, Washington, was completely destroyed by fire. Petitioner had fire insurance policies in effect with respect to this property in the amount of $215,-400, and as a result of the fire, it recovered $197,580.53 under the policies. There is no issue in this case with respect to these proceeds, although they constitute a part of the factual background and will be referred to later as the proceeds under the primary fire insurance policies.

As of August 9, 1952, there were also in effect two other insurance policies issued by Illinois Appleton & Cox, Inc., Chicago, Illinois, pursuant to authorization granted to that company by certain insurers and underwriters at Lloyd's, London. These policies provided that pursuant to such authorization "the Underwriters do hereby bind themselves, each for his own part and not one another. Business Interruption Including Contingent Indemnity Against Fire And Extended Coverage Perils." Each policy was in favor of the assured, The Perma Products Company of Cleveland, Ohio, "On the Use and Occupancy of all buildings and/or structures and/or machinery and/or equipment contained therein upon the premises owned and/or leased and/or occupied by the Assured situated at (1) 7001 Morgan Avenue, Cleveland, Ohio, (2) E/S Pennsylvania Avenue, Chehalis, Washington, and operated by the Assured principally as Shingle Dipping Plant." It will be noticed that each policy covered both plants.

Each policy covered a maximum period of twenty-five weeks. They were identical in their terms with the exception of the amount of loss coverage. One policy provided a loss coverage of $4,000 per week in the case of a total suspension of business and a proportionate amount for partial loss of production, while the other policy provided a loss coverage of $6,000 per week in the case of a total suspension of business and a proportionate amount for partial loss of production. Using the $4,000 policy, it provided as follows:

"Insuring Clause.

"Total Suspension: The conditions of this contract of insurance are that if the said buildings and/or structures and/or machinery and/or equipment contained therein shall be destroyed or damaged by fire, lightning, explosion, aircraft, vehicles, windstorm or smoke as hereinafter defined, occurring during the term of this Certificate so as to necessitate a total suspension of business, then this insurance shall be liable at a rate of $4,000.00 per week for such total suspension.

"Partial Suspension: If the property damage due to perils insured against results in partial suspension of business then this insurance shall be liable for such proportion of $4,-000.00 per week which the proportion of reduction in output bears to the total production which would, but for such partial suspension, have been obtained during the period of partial suspension."

Following the foregoing insurance clause were a number of separate paragraphs under the heading "Conditions" which

included an Electrical Exemption Clause, a paragraph excluding coverage occasioned by bombardment, invasion, operations of armed forces while engaged in hostilities, a paragraph requiring the insured to use due diligence in attempting to avoid the happening of any peril insured against and in resuming full operation of business as early as practicable after any interruption, a cancellation clause, and the following paragraph upon which the Commissioner principally relies.

"In consideration of the fact that this insurance is written on a per weekly basis, it is understood and agreed that the Assured shall make a report to the Underwriters at six months from the inception date of this Certificate and further reports at intervals of six months during the currency of this Certificate showing the approximate total of the Assured's net profit plus fixed charges for the preceding 12 months. Should the Assured fail to make such report the Underwriters in the event of claim hereunder, shall be permitted to inspect all records of the Assured's operations at the premises covered hereunder to determine if the amounts insured exceed the Assured's net profit plus fixed charges. Should the amounts insured hereunder exceed the Assured's net profit plus fixed charges then the weekly amounts payable will be reduced to 1/52 of the amount of the Assured's actual net profit plus fixed charges during the 12 months period preceding the occurrence of the loss and the total amount of the insurance hereunder shall be reduced in the same proportion, it being understood and agreed that the maximum period of insurance for which loss may be claimed shall not exceed that previously stated in the conditions of this Certificate."

Coverage under the policies commenced on the tenth day following the date of damage. During negotiations with the insurance adjuster, the adjuster determined that petitioner had no production at Chehalis for the first two weeks of coverage and that the value of output performed (at Cleveland only) during this two weeks period was 11.748% of anticipated total output, leaving loss of 88.2513%. During the remaining twenty-three weeks of coverage, petitioner was able by purchasing manufacturing material from others to supply a portion of demand, and giving consideration to this fact the adjuster determined that the value of output at Cleveland, plus value of work performed at Chehalis, represented 21.2613% of anticipated output for these twenty-three weeks, leaving loss of 78.7387%. Applying these percentages to the $10,000 per week coverage, he fixed the insured loss at $8,825.13 for each of the first two weeks and at $7,873.87 for the remaining twenty-three weeks of coverage. This resulted in a total of $198,749.27, which amount was paid by the insurers in July, 1953, and accepted by the petitioners in full discharge of its claims under the Lloyd's policies.

Subsequent to the destruction of the plant on August 9, 1952, and within one year after the date, the petitioner expended in excess of $198,749.27, received under the Lloyd's policies, together with all the proceeds received under the primary fire insurance policies above referred to, on a new manufacturing plant, including buildings, structures, machinery and equipment for such a plant, for the scoring and staining of cedar shingles similar or related in service or use to the property destroyed in the fire.

Petitioner included in its 1952 return a "Gain from Involuntary Conversion" in the amount of $246,948.34 derived from the insurance proceeds paid with respect to the fire loss, and elected to treat such gain as nontaxable gain from involuntary conversion under Section 112 (f) of the Internal Revenue Act of 1939, 26 U.S.C.A. § 112(f). Included in such proceeds, which gave rise to the reported gain, were both the proceeds received under the primary fire insurance policies

covering the buildings and machinery and the proceeds in the amount of $198,-749.27 received with respect to the two policies carried with Lloyd's, London. The Commissioner treated the proceeds from the primary fire insurance policies as nontaxable income, but treated the proceeds received from the two policies issued by Lloyd's, London, as ordinary taxable income, allocating $151,506.05 thereof to the calendar year 1952 and $47,243.33 to the calendar year 1953. This resulted, through processes not here necessary to recite in detail, in a reduction in the carryback to the year 1952 of petitioner's net operating loss for the calendar year 1953; a denial of petitioner's claim of overpayment for the calendar year 1952 in the amount of $17,772.01; and the deficiency assessment for the calendar year 1952 in the amount of $46,722.19.

■ It will be seen from the foregoing that the issue involved is the proper treatment for income tax purposes of the proceeds received by the petitioner under the two policies issued by Lloyd's, London. If these insurance policies insured loss of profits, rather than the loss of use and occupancy of the property destroyed, the proceeds are to be treated as taxable income. Since such proceeds are received in lieu of profits which are taxable, the proceeds also should be taxable. Miller v. Hocking Glass Co., 6 Cir., 80 F.2d 436, certiorari denied 298 U.S. 659, 56 S.Ct. 681, 80 L.Ed. 1384; Marcal Pulp & Paper, Inc. v. Commissioner, 30 T.C. 1345, 1350, affirmed, 3 Cir., 268 F.2d 739, certiorari denied, 361 U.S. 924, 80 S. Ct. 294, 4 L.Ed.2d 240; Massillon-Cleveland-Akron Sign Co. v. Commissioner, 15 T.C. 79, 84–85. If, however, the proceeds received constituted a payment for loss of use and occupancy, as distinguished from loss of profits, they are properly treated as nontaxable gain from involuntary conversion under Section 112 (f) of the Internal Revenue Code of 1939. Williams Furniture Corp. v. Commissioner, 45 B.T.A. 928; Piedmont-Mt. Airy Guano Co., 3 B.T.A. 1009; Flaxlinum Insulating Co. v. Commissioner, 5

B.T.A. 676. There is no dispute between the parties with respect to the well settled principles above stated. The determination of the question accordingly depends upon the proper construction which is to be given to the provisions of the policies under which the proceeds were received.

■ It is the Commissioner's contention that the basic concept of use and occupancy insurance is the payment of a flat per diem or per weekly amount for the loss of the right to use the property, which amount is entirely independent of and in no way based upon the amount of lost profits; that the provisions of the policies hereinabove set out, considered together, show that it was not the intention of the parties to provide for the payment of a fixed sum regardless of the extent of lost profits; that on the contrary the weekly amount to be paid in the event of the partial suspension of business (which was the situation in this case, since the policies covered both the plant at Chehalis and the plant at Cleveland) was dependent upon the assured's net profit plus fixed charges for the preceding twelve months; that the amount of the recovery was actually determined upon the basis of net profit plus fixed charges for the preceding twelve months; and that, accordingly, the amount recovered actually represented lost profits plus fixed charges rather than loss of use and occupancy at a fixed amount and was taxable income. The Tax Court sustained this contention.

This contention is in direct conflict with the express provisions of the insuring clause of the policy. The insuring clause does not insure lost profits. It contains no reference to lost profits. It provides for the payment of a fixed sum ($4,000 and $6,000) per week in the event of a total suspension of business, not dependent in any way upon the amount of profits. In the event of a partial suspension of business it provides for a payment of such proportion of $4,000 and $6,000 as the "reduction in output" bears to the "total production" which would, but for such partial sus-

pension, have been obtained. The amount of payment is again not dependent in any way upon the amount of profits. The "output" or "production" of a plant is entirely different from its operating profit. If a plant is operating at a loss, a fire can cause a large reduction in output or production without causing any loss in profits. If the insurance is intended to cover loss of use and occupancy, the insured is entitled to a recovery, even though there is no loss of profits. If there is only a partial suspension of business, the normal way to measure what proportion of the full amount of the policy is to be recovered, would be to base it upon the proportionate amount of loss of output or production, as was provided in the present case, instead of upon loss of profits. Clearly, there is no insurance of lost profits under the insuring clauses of the policies in this case.

In order to sustain the Commissioner's contention we must necessarily look to other provisions of the policies. The Commissioner contends that the necessary provisions are found in the paragraph included under the general heading of "Conditions", following the Insuring Clause and hereinabove set out. He points out that this paragraph requires the Assured to make reports to the Underwriters at six months intervals showing the approximate total of the Assured's net profit plus fixed charges for the preceding twelve months and provides for payment in certain instances of amounts based upon such actual net profits plus fixed charges. We do not construe the provisions of this paragraph as sustaining the Commissioner's contention.

These provisions were not effective unless the amount of the recovery exceeded the Assured's net profits plus fixed charges. In the present case, the provisions of this paragraph played no part in determining and paying the $198,749.27 liability of the insurers under the policies. According to the adjuster's computations the petitioner would have made $206,930.16 in profits during the period if there had been no fire. The amount of the recovery did not exceed the Assured's net profits plus fixed charges, and the provision was not effective. Actually, the petitioner suffered a loss of $111,749.82 during the period, making a total loss of $318,679.-98. If the Commissioner's theory be applied, namely that the policies actually insured loss of profits and fixed charges not exceeding the $10,000 per week maximum provided by the $4,000 and $6,000 limits, the petitioners would have been entitled to recover the full $250,000 the maximum limits of the policies. Yet, the liability was not computed or paid upon that basis, and the petitioner actually received a much smaller amount.

An analysis of the partial suspension provision of the policies plainly shows a lack of correlation between loss of profits and recovery under the policies. For example, if the Chehalis plant had operated at a loss for the twelve months period immediately preceding the fire, but the net profits plus fixed charges at the Cleveland plant for the same period amounted to $250,000, the petitioner would have been entitled under the terms of the policies to receive a percentage of the $10,000 weekly amounts, even though the plant which was destroyed had operated at a loss and there was no loss of profits. This percentage would be based upon the reduction in *output* at the Chehalis plant, not upon any reduction in profits.

Finally, we believe it follows from the plain wording of the paragraph referred to that the computation of past profits for the preceding twelve months was for the purpose of limiting the liability of the insurer, instead of creating any liability. It did not become effective *unless and until* the amount of liability *determined under other provisions* of the policy exceeded a certain amount. It states *"Should* the amounts insured hereunder exceed the Assured's net profit plus fixed charges, *then * * *"* the weekly amounts payable under the policy will be *reduced.* (Emphasis added.) These are words of limitation, not words

of promissory import. They are used in that part of the policy placing other limitations upon the insurer's liability. They are not part of the insuring clause. They do not promise one cent not previously provided by the insuring clause. The fact that this limitation of the amount of the recovery, which recovery is computed under other provisions of the policy without regard to the existence or absence of profits, is one based on the amount of profits, does not, in our opinion, change the character of the recovery even though it may be reduced in amount. The computation of the recovery and the limitation thereof, if necessary, are separate processes based on different factors.

As pointed out in Jacksonville Oil Mills v. Stuyvesant Ins. Co., D.C.W.D.Tenn., 3 F.2d 1006, 1009, loss of use and occupancy is loss of the right to the use of the property, regardless of whether such use might or might not be remunerative. The difference in the two kinds of insurance and the difference in wording to put each kind in effect was well known to insurers. If the parties intended in this case to insure loss of profits, it would have been an easy and simple thing for the policy to so state. It will be noticed that in Williams Furniture Corp., 45 B.T.A. 928, a policy originally covering loss of profits was later changed by endorsement so as to insure loss of use and occupancy instead. It will also be noticed that in the Hocking Glass Co. case, the Marcal Pulp & Paper, Inc. case, and the Massillon-Cleveland-Akron Sign Co. case, referred to above, the policy in each instance expressly insured against an actual loss of net profits. It was not so provided in the present case. On the contrary, the policies expressly state that the insurance is "On the Use and Occupancy of all buildings," machinery and equipment at the two plants referred to.

In the negotiations for a settlement, the adjuster asked petitioner for a great deal of factual information about the operation of the business, including sales, cost of sales, selling and administration expense, and net profits, all of which the petitioner willingly furnished. The adjuster used this information, either given in the form of dollars or given in the form of production figures translated into dollars, in determining the percentages which he applied to the $4,000 and $6,000 limits of the two policies. The Commissioner contends that this actually resulted in the settlement being based on lost profits rather than a loss of use and occupancy, and that the petitioner in accepting the settlement so arrived at acquiesced in this construction of the policy. We do not give to the settlement this effect. Petitioner's Executive Vice-President testified that the adjuster "wanted all kinds of figures" which were given to him, that he didn't know then and he didn't know at the time of the settlement just how the settlement figure was arrived at, and that although he thought the petitioner was entitled to $25,000 to $28,000 more than was offered, the offer, after being discussed for a day or two by the directors and the people interested, was accepted. We are of the opinion from a reading of the testimony of this witness that, notwithstanding the method employed by the adjuster in determining the amount to be offered in settlement, the petitioner was basing its claim upon loss of production and was interested more in the final amount of the recovery than in the method used by the adjuster in determining that amount. In addition, we think that although the adjuster used estimated lost sales and lost profits in determining the percentages applicable to the partial suspension of business, his final determination of 88.2513% for the first two weeks of coverage and 78.738% for the succeeding twenty-three weeks were the percentages of anticipated total output lost by the fire, not percentages of lost profit. His "Statement of Loss" filed as Joint Exhibit 6-F so indicates.

We are of the opinion that the proceeds received by the petitioner from the two Lloyd's policies represented loss of use and occupancy of the insured prop-

erty and should have been so treated by the Commissioner.

The decision of the Tax Court is reversed and the case remanded for further proceedings consistent with the views expressed herein.